UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
RICHARD EINSTEIN DAVIS, JD

    Plaintiff,                                         **COMPLAINT**

vs.

MERCK & Co.,

    Defendant.
-------------------------------------------------------x

    By and through his counsel, Michael H. Sussman, plaintiff complains of defendant as follows:

### I.    PARTIES

1. Plaintiff, Richard Einstein Davis, J.D. is an African American male of legal age who is domiciled within this judicial district.

2. Defendant Merck & Co., is a multi-national company which does business within this judicial district.

### II.    JURISDICTION AND VENUE

3. As plaintiff alleges that defendant violated his rights arising 42 U.S.C. § 1981-a, this Honorable Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3 & (4) and 42 U.S.C. § 1988.

### III.    STATEMENT OF FACTS

4. Plaintiff a cybersecurity, eDiscovery, computer forensics, and data privacy professional with over 20 years of corporate and international advisory and consulting experience, served as a Director of Compliance and Risk Management for Merck's Cyber Fusion Center, an international cyber security operations function for defendant, where he was entrusted with the significant responsibility to directly supervise five critical cybersecurity security

1

operations functions (Cyber Threat Intelligence, Incident Response, Threat Defense Operations, Digital Forensics, and Data Loss Prevention) co-located in three international hubs, which, cumulatively, protected inter alia, the company's reputation, infrastructure, and intellectual property from cyber-related threats.

5. The Cyber Fusion Center was created by Merck in response to the massive 2017 NotPetya ransomware attack, one of the largest ever, that crippled the company's ability to operate and cost the company upwards of $1.5 billion in damages.

6. Plaintiff was the only Black cyber security operations Director in the Chief Information Security Officer's organization which consisted of over 250 individuals.

7. For the nearly three years plaintiff was employed by defendant, he successfully performed his job duties achieving back-to-back "outperform" performance ratings as well as the respect of his colleagues while he directly and indirectly, supervised upwards of more than sixty employees, contingent workers (assigned contractor(s)), and project managers spread through business units in the U.S., Czech Republic and Singapore.

8. On or about September 7, 2022, defendant, while characterizing plaintiff's comportment as that of a "true gentleman," summarily fired plaintiff by video conference with no termination notice or written explanation for the basis of plaintiff's termination, and further indicated that the decision was final with no recourse.

9. Plaintiff was incredulous as he was completely blindsided by the ten-minute, career altering conversation with his supervisor, during which he was afforded no opportunity to review any information or rebut any allegations that effectively vaporized all the goodwill he built during his tenure, ended his career at a company he loved and abruptly severed his connections his teams, the people and corporate initiatives he was deeply invested in.

10. Plaintiff's supervisor, who reports directly to the Merck Chief Information Security Officer, advised plaintiff that his termination resulted from plaintiff's alleged violation of the

company's ethics policy, and plaintiff's supervisor did so without disclosing any information about any allegations of discriminatory, unethical, or illegal actions by plaintiff.

11. Plaintiff committed no such violation(s), and no reasonable person could conclude he did so, let alone plaintiff's own supervisor, who supported the very decision which appears to have given rise to this pretext.

12. In mid-October, 2022, defendant began recruiting new Directors for each of the individual functions and manifold duties previously in plaintiff's managerial remit.

13. On or about April 2020, plaintiff identified a technology that, in combination with unique workflows designed by plaintiff, could be implemented and scaled to address critical gaps in Merck's intellectual property data loss prevention (DLP) strategy and address other enterprise data management challenges.

14. For two years, plaintiff presented and socialized the benefits of the technology, hereinafter "DLP Technology," and his unique workflow designs in numerous meetings with senior IT leaders to build consensus with his leadership and technology stakeholders, who eventually gave approval and released funding to implement said DLP Technology.

15. The DLP Technology and plaintiff's uniquely designed workflows, which were implemented and fully operationalized at Merck, and as envisioned, have significantly enhanced the company's ability to detect and prevent the exfiltration of highly sensitive regulated data, pre-patent protected content and other intellectual property as well as enable the rapid analysis of phishing emails and simultaneously improved the company's Global Privacy Office's ability to more rapidly meet the company's data privacy requirements imposed by domestic and ex-U.S. data privacy regulations.

16. To assist in both implementing and operationalizing the DLP Technology, defendant contracted with a third-party vendor in the third quarter of 2021 to onboard a contingent worker contractor (assigned contractor) to so assist plaintiff and his team with the steps of

conducting testing and obtaining the necessary Software Development Lifecycle (SDLC) documentation which would then enable plaintiff's DLP team to implement and operate the DLP Technology.

17. Ab initio, plaintiff conveyed to the contractor the scope of the activities he would be engaged in by providing assigned contractor with a project overview, plaintiff's vision of how the DLP Technology and program would be implemented and rolled out and delivered in a "product as a service" model to address data management challenges faced by different functions within the company.

18. The data management capabilities that would result from the plaintiff's unique application of the technology and workflows to a variety of data challenges could only be achieved by establishing a collaborative, cross-functional, and cohesive team of IT and other SME's whose activities were managed by Agile methods (Agile is a well known and industry accepted approach to managing complex projects).

19. In order to achieve the desired DLP Technology project outcomes, risk reduction objectives, and return on investment plaintiff assured his leadership; it was imperative that the assigned contractor follow plaintiff's directives and attend regularly scheduled Agile meetings with the DLP Project team, and these requirements were conveyed in the professional and tactful manner characteristic of plaintiff's leadership style.

20. Plaintiff provided directives the assigned contractor concerning the need for the DLP Technology to meet Merck's rigorous technology documentation requirements within specified timelines as a precursor to implementation.

21. During the fourth quarter 2021 time frame, the Merck procurement department was negotiating a software license agreement with the DLP Technology vendor, and on or about November 15, 2021, plaintiff received a phone call from the DLP Technology vendor sales and system engineers who had met with assigned vendor. The DLP Technology team

expressed concerns that the assigned contractor's relevant knowledge base of the technology's capabilities and functionality was not at the level the assigned contractor professed to have.

22. Plaintiff subsequently met with assigned contractor to discuss the DLP Technology internal marketing and awareness activities required to cultivate awareness and adoption of the DLP Technology capability. These activities entailed scheduling presentations with different stakeholders in the organization and plaintiff provided assigned contractor with editable, approved, standardized and branded presentation templates to be used when meeting with prospective users while soliciting data for tightly controlled "proof of concept" demonstrations of the DLP Technology efficacy.

23. Plaintiff was involved in an uncharacteristically tense meeting with the assigned contractor in or about mid to late December of 2021, in which plaintiff was preparing the assigned contractor to engage with the legal department. Rather than use the approved, standardized, and branded materials plaintiff had provided him with to socialize the DLP Technology capabilities, he decided he wanted to use his own off-brand materials and dismissively stated that he knew how to work with lawyers, and that the presentation materials which plaintiff had been painstakingly refined over many months and already previewed with legal department colleagues, would not resonate with them.

24. By December of 2021, the assigned contractor had become unresponsive and resistant to plaintiff's direction, resisting attending Agile Scrum meetings intended to keep project timelines and budgets on track, and deviated from conventional Merck approaches related to the completion of SDLC documentation.

25. During the December time frame, it became clear that the assigned contractor's unwillingness to accept necessary guidance from plaintiff was an issue and that he would

replace the assigned contractor before the operationalization and implementation phase of the DLP Technology.

26. In late December 2021, plaintiff received an after-business-hours phone call from the Associate Director (A.D.) directly and solely responsible for the relationship with the assigned contractor's onboarding/offboarding activities and agencies related to the plaintiff's project, in which the A.D. alerted plaintiff about negative race-based sentiments harbored by the assigned contractor and directed towards plaintiff; this was the first time plaintiff became aware of any claims of racial animus between assigned contractor and plaintiff and A.D. was apologetic about not raising his concerns to plaintiff sooner.

27. Plaintiff is acutely cognizant of the scope of managerial remit and discretion and the important role contingent workers (contractors) play in the organization. He was shocked when the A.D. indicated that the assigned contractor did not see "eye to eye" with plaintiff and reasonably concluded that this statement by assigned contractor to A.D. manifested a disregard and contempt for plaintiff's role as a Merck Director.

28. In the call with plaintiff, A.D. informed plaintiff that assigned contractor, who is white, further stated that plaintiff referenced a preference of "chocolate over vanilla ice cream" in a way that assigned contractor insinuated that plaintiff had a racial bias or animus against assigned contractor, and assigned contractor further indicated to A.D. that he was going to speak with plaintiff's supervisor.

29. In the same after hours call, A.D. also indicated that assigned contractor stated to him that plaintiff was "too close" to the DLP Technology project, a project that plaintiff spent over two years formulating and presenting to various Senior IT Leadership teams and stakeholders.

30. Given the foregoing, plaintiff reasonably concluded that assigned contractor no longer wished to take direction from a black director and that assigned contractor's behavior and

6

expressed sentiments jeopardized the DLP Technology project team cohesion and its ability to implement the technology within the specified planned timelines.

31. Upon information and belief, assigned contractor contrived a campaign in which he published a series of unsubstantiated, spurious racial, and other shifting allegations specifically intended to harm the reputation of the plaintiff.

32. Upon information and belief, defendant adopted assigned contractor's allegations of spurious racial and inherently defamatory allegations to the detriment of plaintiff.

33. Plaintiff has never made and never would make any comment in any conversation where the assigned contractor or any person could impute racial animus or any form of bias to him, his actions, or his statements.

34. Plaintiff was surprised that the A.D., with whom plaintiff had an excellent working relationship, had been aware of assigned contractor's allegations for some time prior to contacting plaintiff, did not raise these concerns himself sooner to plaintiff, plaintiff's supervisor or the Office of Ethics himself.

35. In late December 2021, plaintiff's supervisor informed plaintiff in a video meeting that he had been contacted by the assigned contractor about unspecified issues assigned contractor had with plaintiff, and plaintiff's supervisor, without disclosing any actionable or substantive specifics of his conversation with assigned contractor, suggested plaintiff speak with the assigned contractor, ostensibly with the objective of appeasing the contractor.

36. Plaintiff believes that the fact that his supervisor recommended having a conversation with the assigned contractor, who by this time had publicized his negative sentiments about plaintiff, was indicative of plaintiff's supervisor's belief that there were no actionable or credible violations or deviations from policy were proffered by assigned contractor.

37. Plaintiff, during the same late December 2021 video meeting with his supervisor, discussed the challenges he was having with the assigned contractor, which was for plaintiff without

precedent in the Merck work environment and culture, and further expressed his concern that this disgruntled assigned contractor's behavior was problematic to the point of jeopardizing the project while making plaintiff's workplace hostile.

38. Plaintiff made it known to both his supervisor and the A.D. responsible for the assigned contractor that he no longer wanted an uncooperative assigned contractor on his project and was concerned that the assigned contractor had activated an agenda to both jeopardize the DLP Technology project and damage plaintiff's good reputation among his colleagues and peers.

39. Plaintiff was fully transparent in communicating his intention to exercise his managerial discretion to take the reasonable and appropriate steps to remove the disgruntled assigned contractor from the DLP Technology project, and at no time was there any statement or guidance from any party that plaintiff's legitimate exercise of managerial discretion to replace the assigned contractor would or might either be regarded as retaliatory or violate defendant's ethics policy.

40. Indeed, such policies are vague and do not proscribe any action plaintiff initiated.

41. Plaintiff was not motivated by any retaliatory intent as contemplated by any policy; he had independent, good faith reasons grounded in the corporation's interests to replace the first assigned contractor with the second assigned contractor.

42. The A.D. responsible for the consulting agency relationship, like plaintiff's supervisor, never at any time indicated that by replacing the initial project assigned contractor, plaintiff was engaging in any form of prohibited personnel practice. Neither plaintiff's supervisor nor the A.D., as the assigned contractor's agency contract manager and supervisor of record for assigned contractor in defendant's Workday Human Resources system (the system in which onboarding and offboarding of personnel takes place), took any action to prevent contractor's removal from the project.

43. After being notified that he would be removed from the DLP Technology project, the assigned contractor sent an email to several of plaintiff's subordinates and colleagues, indicating that he had been in "confidential conversations" for some time with his agency, the A.D., and others about unspecified allegations related to plaintiff and that if he were not reinstated, he would then file an ethics complaint. Plaintiff notably was not on the email thread, nor was plaintiff at any time involved in any conversations with assigned contractor about any issues assigned contractor had with plaintiff. Plaintiff would later obtain a copy of the email and provide it to the Office of Ethics investigator.

44. Several weeks after contractor was terminated, plaintiff obtained a replacement second assigned contractor through a recruiter managed by the A.D., who was both personally known to plaintiff and in possession of the requisite experience and specific DLP Technology competencies to complete the SDLC documentation and execute plaintiff's directives related to the next critical phase of DLP Technology Operationalization.

45. Unlike the other assigned contractors assigned to other projects, this newly assigned contractor for the DLP Technology project was assigned to plaintiff's organization chart in Workday.

46. Over the following weeks, plaintiff and the project team made significant progress, the SDLC documentation was completed, the DLP Technology project infrastructure was implemented and operationalized, proofs of concept for several functions were conducted for: the Records and Information Management group, Merck Research Laboratory DLP Keyword list, and the Global Privacy Office GDPR Data Subject Access Request analysis.

47. Several months after plaintiff replaced the disgruntled assigned contractor, a member of the company's Office of Ethics unit interviewed plaintiff.

48. The Office of Ethics investigator, by video meeting, specifically instructed the plaintiff not to record any discussions, did not provide plaintiff with a copy of any complaint leveled against

9

him, did not indicate the nature of the complaint, and never once questioned plaintiff as to whether the assigned contractor's behavior jeopardized the project created a hostile environment for plaintiff or presented a risk to Merck.

49. Plaintiff honestly responded to the questions posed by the Office of Ethics representative of the ethics department.

50. Several months later, for no clear reason, the Office of Ethics representative again re-interviewed the plaintiff, who again forthrightly responded to her questions.

51. By September 2022, plaintiff was successfully performing his many duties managing the five teams within his managerial remit, had regular one-on-one meetings with his supervisor, received positive performance feedback and engaged in numerous tasks critical to maintaining the company's security posture.

52. However, without notice or due process, plaintiff's supervisor wrongfully terminated plaintiff on or about September 7, 2022.

53. Plaintiff's general comportment, actions and statements as a Director in the Chief Information Security Officer's organization have always been aligned with corporate values and his goal of maturing the company's intellectual property protection capabilities by implementing the DLP Technology in a timely fashion while fulfilling his remit of acquiring, developing, and retaining the best talent in support of this mission.

54. Plaintiff's actions heretofore have always been in the company's interest and with the assent of his supervisor and the company's A.D. coordinator of vendor relations.

55. Plaintiff's summary termination, with no termination letter or explanation of the bases for termination, represented the first, only, and last disciplinary action of any kind against him in his nearly three years of exemplary leadership with the company, during which time he had back-to-back "outperform" performance ratings while managing more teams and direct reports than any other similarly situated Director.

56. Defendant provided plaintiff with no neutral, non-discriminatory reasons or bases for their adverse actions towards plaintiff, which were wholly inconsistent with the defendant's position statement on Human Rights, thereby directly abrogating plaintiff's civil rights in contravention of the law.

57. To plaintiff's knowledge, no Caucasian managers have been terminated for justifiably exercising their managerial discretion to implement any like approved personnel changes in furtherance of corporate objectives.

58. Upon information and belief, other non-black managers have breached company security policies and retained their jobs or been subjected to progressive discipline and in some instances, no action has been taken at all.

59. Race was a determining factor as it relates to the foregoing pattern of behavior and actions by the disgruntled assigned contractor and the lack of due process afforded plaintiff by defendant in the termination process.

60. Plaintiff's exercise of managerial discretion given him by defendant was not violative of any company policy.

61. Plaintiff and plaintiff's supervisor regularly engaged in the encouraged common practice of "skip" and "open door" meetings, where a manager meets with team members not directly reporting to them in their supervisory chain of command to engage in mentoring and keep their finger on the organization's pulse.

62. As a result of defendant's adverse action, plaintiff has suffered substantial pecuniary loss.

63. As a result of defendant's adverse action, plaintiff's reputation and decades of good standing in the industry and among his peers has suffered as a direct result of defendant's publication of false and defamatory statements.

64. As a result of defendant's adverse action, plaintiff has suffered compensable emotional distress and is in the care of a therapist.

65. Defendant's conduct is blatantly discriminatory, calculatedly malicious, and cannot be justified.

66. Accordingly, plaintiff seeks an award of punitive damages against defendant to deter other like entities from like egregious violations of law.

### IV. CAUSES OF ACTION

67. Plaintiff incorporates paras.1-66 as if fully re-written herein.

68. By intentionally terminating plaintiff on account of his race, defendant violated 42 U.S.C. section 1981-a.

69. By intentionally terminating plaintiff on account of his race, defendant violated section 296 of the Executive Law of the State of New York.

### V. PRAYER FOR RELIEF

WHEREFORE plaintiff prays that this Honorable Court accept jurisdiction over this matter, convene a jury to hear the matter, award to plaintiff compensatory and punitive damages, order defendant to reinstate plaintiff to his former position, award plaintiff the attorneys' fees and cost arising from the prosecution of this matter and enter any other award necessary to further the interests of law and equity.

Dated: October 26, 2022

Respectfully submitted,

MICHAEL H.SUSSMAN [3497]

SUSSMAN & ASSOCIATES
PO BOX 1005
GOSHEN, N Y 10924
(845)-294-3991
Counsel for Plaintiff